# SECOND AMENDED CHARGE OF UNLAWFUL DISCRIMINATION

| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | AGENCY<br>☐ FEPA<br>xx EEOC | CHARGE NUMBER<br>438-2015-00345 |
|---|---|---|
| <u>Virginia Council on Human Rights</u> and EEOC<br>State or local Agency, if any | | |

| NAME (Indicate Mr., Ms., Mrs.)<br>Ms. Michele Burke Craddock | HOME TELEPHONE (Include Area Code)<br>(804) 317-5047 |
|---|---|
| STREET ADDRESS<br>406 North Meadow Street | CITY, STATE AND ZIP CODE<br>Richmond, Virginia 23220 | DATE OF BIRTH<br>9/8/1966 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below)

| NAME<br>LeClair Ryan, a Professional Corporation | NUMBER OF EMPLOYEES, MEMBERS<br>500 or more | TELEPHONE (Include Area Code)<br>(804) 783-2003 |
|---|---|---|
| STREET ADDRESS<br>951 East Byrd Street | CITY, STATE AND ZIP CODE<br>Richmond, VA 23219 | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON  (Check appropriate box(es))<br>☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☒ OTHER *(Specify)*<br>*Class charge* | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST  LATEST<br>2003  March 4, 2015<br>☒ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE   (If additional space is needed, attach extra sheet(s)):

1. I have been employed by LeClair Ryan, P.C. ("LeClairRyan" or "Firm"), a Richmond, Virginia based law firm, since 2003. Through my employment, I have suffered gender-based treatment, and the impact of policies and practices having gender adverse consequences, in compensation, promotional opportunities and other terms and conditions of employment. Other similarly situated female Firm employees have suffered the same forms of discrimination, on a class-wide basis and I file this as a class charge.

2. LeClair Ryan is a national law firm and has 25 offices nationwide. Employing approximately 720 employees, including 373 attorneys, the National Law Journal lists it as the 144th largest firm in the United States. The Firm has non-equity partners ("Officers") and equity partners ("Shareholders").

3. LeClairRyan has a history of gender-based discrimination toward its female attorneys in terms of compensation, leadership, selection, advancement and other terms and conditions of employment. This is most apparent in its treatment of, and the impact of policies and practices on, female shareholders and female attorneys seeking shareholder status and the attendant terms of employment denied them but enjoyed by the Firm's male shareholders. Of 154 shareholders in the Firm, only 24, or 15.4% are female. The top senior management is made up of exclusively male shareholders, Gary LeClair ("LeClair"), Michael Hern ("Hern") and David Freinberg ("Freinberg"). Female attorneys, including myself, have been reluctant to complain about the discriminatory treatment because of fear of repercussions. Those who question senior management do not last long. I have suffered retaliation for my opposition to the gender based practices that follow.

4. The Firm's 14 member Board of Directors ("Board") consisting of Shareholders has 3 female members. The lead Director is male. There are no disinterested Directors. The compensation and executive committees of the Firm are also predominately male. The executive leadership and governance of the Firm is controlled by a Chair, Vice-Chair, CEO, Secretary and Heads of Litigation and Corporate, all of whom are male. LeClair and Hern tightly control the process of appointment to those positions and the Directors, and other "chosen" individuals beholden to them in return.

5. The Firm Chair, LeClair, has historically made or directed the bulk of all policy, compensation and governance decisions for the Firm, ostensibly with the input of other male executive leadership, including Hern, all of whom are under life-time employment contracts in amounts not disclosed to the Firm shareholders. Recently, Freinberg has taken a more active role, with Hern. Compensation decisions come from within this group; for example,

*(continued on next page)*

EXHIBIT 1

Case 3:15-mc-00003-REP Document 1-1 Filed 04/24/15 Page 2 of 9 PageID# 9

*(page 2 of 9)*
Charging Party: Michele Burke
Respondent: LeClairRyan, a Professional Corporation
Amended Charge No: 438-2015-00345

recommendations are made by the heads of Litigation or Corporate, and approved by Freinberg for recommendation to the Board. The supposed "check" on the system, Chief Legal Officer Bruce Matson ("Matson") also male, reportedly also has a 3 month sabbatical written into this "soft landing" contract, which guarantees him more than $1 million annual compensation.

6. A few females serve on Firm committees, but generally are, likewise, subject to political control of the senior male leadership and/or non-lawyer administrators. These are not female shareholders, but token female positions. For example, when I was recommended for promotion in 2013, the promotions committee was comprised of 4 females, but only 1 was a shareholder - 3 were non-lawyer administrators, including Hern's soon to be daughter-in-law and one of his best friend's daughters - and 5 male shareholders from the male executive ranks, including Hern, Freinberg, the male heads of the Corporate and Litigation Departments.

7. I am a 48-year old female shareholder of the Firm. My practice involves complex business litigation, including fiduciary litigation such as shareholder derivative suits. There are 177 business litigation lawyers in the firm, 80 of whom are shareholders (72 are male shareholders and only 8 are female shareholders). Of the 11 shareholder business litigators in the Richmond, Virginia office, I am the only female shareholder. Despite excellent performance and exceptional results under objective standards, I have been denied compensation which similarly situated male shareholders and officers have been provided.

8. By Firm policy, Officer and Shareholder compensation is to be determined by (1) objective criteria, including 3-year average numbers for collections from hours worked, originations, matter management, compliance with billing and time entry deadlines and team leadership, and (2) subjective criteria, including a Shareholder's/Officer's self-evaluation and the recommendation from the male CEO, Freinberg, with input from the male Department Team leaders. Although the criteria appear to provide a transparent process, the application of the policy is cloaked in secrecy. As in any organization, however, information leaks out revealing subjective application of Firm compensation policy, including a lot of back-office deals, favoring male shareholders.

9. Exceptional performance in a given year is rewarded through an Extraordinary Bonus Plan, if the Firm makes budget. The Firm does not have a seniority-based system. Material differences in contributions should result in material differences in compensation, or "stars" are to be rewarded, per stated policy. Firm policy also dictates that the Firm's top performers are to be paid in excess of market rates; however, the Firm has implemented the policy to benefit only the top performing male shareholders.

10. In 2013 I met the Firm's stated standards for top performer status. However, in November 2014, contrary to Firm policies and the normal Shareholder review process, the Litigation Department Leader and CEO, both male, tried to coerce me into taking a salary reduction. In doing so, the Firm deliberately failed to follow its policies and practice as it has with male shareholders, which would result in an increase, rather than a decrease, to my compensation. I have suffered targeted retaliatory treatment, including threats of adverse employment actions, regarding my employment.

11. Since well prior to January, 2003, female attorneys of the Firm have been subjected to practices that have discriminatorily treated and impacted females as a class. This includes the processes in place for delaying female elevation to shareholder and, for those females who persevere to obtain shareholder status, how their shareholder compensation is determined, including decisions on "origination credits," which the Firm management uses to determine compensation. Per policy, an Originating Attorney is "the attorney who initially brings in the client and often the attorney who gets the telephone call. As a general rule, once an attorney brings in a client, he/she will forever be the [originating attorney] for all matters for that client." Disputes regarding the designations of Originating Attorney are determined by Freinberg, in his sole discretion, based on input from Hern.

*(continued on next page)*

*(page 3 of 9)*
Charging Party: Michele Burke
Respondent: LeClairRyan, a Professional Corporation
Amended Charge No: 438-2015-00345

12. Hern and Freinberg control decisions that impact origination credit, which in turn drives compensation and promotion decisions. Hern and Freinberg have repeatedly made origination decisions in favor of male shareholders and against female shareholders. Their subjective application of origination decisions has systematically been applied so as to favor male shareholders and disfavor female shareholders and/or has had that effect. Female shareholders who meet objective measures have consistently been denied compensation, resources and support that male shareholders, even with lesser objective achievements, have received.

13. Origination credits are subjectively used to compensate senior male shareholders, many with longstanding client relationships, or male shareholders to whom internal referrals are directed from senior male shareholders, to the disadvantage of female attorneys or shareholders servicing the clients as working attorneys. I have been denied internal referrals from male shareholders on matters for which I was qualified and recommended by other (male) shareholders because the originating male shareholder did not want the work to go to me. I have also been denied working attorney credits on matters where I performed key work leading to a successful resolution at another shareholder business litigator's request, but the male shareholder elected not to give me the credit, keeping it for himself.

14. Additionally, originating attorneys decide what attorneys work on their matters. This "self-selection" perpetuates the male shareholders' ability to reward other male attorneys, officers and shareholders, and determine the rates at which such lawyers are billed to the case, further widening the gender-based compensation disparities. Male originating attorneys often maintain high hourly rates, but bill working attorneys servicing the client, at low rates. Often, the lowest rates are assigned to female working attorneys. A female working attorney being billed at low rates is required to work more hours to reach billing goals and has little time to market for her own originations.

15. On information and belief, female officers and shareholders of the Firm are consistently paid less than comparably situated male officers and shareholders, including in 2014, when the Firm's male Officers were reportedly compensated substantially more than the female Officers. This pay disparity is not limited to the Richmond office but, on information and belief, is systemic and firm-wide.

16. Male shareholders and officers are consistently shown favoritism in compensation and other terms and conditions of employment over female shareholders. Subjective decisions and gender stereotyping by Firm management regularly favor male shareholders over female shareholders. For example, internal referral of work between male shareholders, and not to female shareholders, perpetuates the lack of origination, working attorney or other credits for compensation and promotion purposes. Justification for such action includes stereotyped concerns over a male attorney's need to support a family; as the primary breadwinner in my family, despite the fact that I have had educational expenses for my children and similar economic needs.

17. The Firm has a practice of using efforts to coerce female lawyers, including shareholders, to "agree" to compensation reductions. As indicted below, I have been coerced to sign such an agreement, but refused. On information and belief, at least one female attorney resigned when she was approached by Firm management to substantially reduce her salary when male attorneys were not. The single mother of two and primary breadwinner refused to sign the document purporting to acknowledge her agreement to the salary reduction.

18. Although the Firm prides itself on allowing lawyers to work part time, female attorneys with children, family or medical care obligations are often forced to "buy flexibility" by going "part time" (e.g. a 20% reduction in billable hour and collection requirements with commensurate 20% reduction in compensation.) However, male shareholders with medical or family care issues, or less productive years, are regularly "carried" and not pressured to take a part time status, or any reduction of compensation. Such reductions in compensation make shareholder buy-in more difficult for female attorneys seeking shareholder status. It has a disparate impact on both the ability for, and time under which, females to become shareholders, impediments not presented for male attorneys seeking

*(continued on next page)*

shareholder status. At least one female shareholder has been pressured to go part time (with compensation reduction), unlike male attorneys with medical or family care obligations. Another female shareholder who left the Firm was unable to afford the $100,000 buy-in because of the compensation reduction associated with part-time status. Part-time status is by no means protected. Another female shareholder was de-equitized after going part-time.

19. Time taken by female attorneys for maternity leave, the resulting 'ramp up time in obtaining work, and the resulting lag in collections upon a return to work after going "part time" has had a severe impact on female associates' ability to be promoted to Officer, because Firm policy requires at least 10,000 hours of billable work before an associate is eligible for promotion. The lag in obtaining work and resulting lag in collections affect the 3-year performance metrics that are the major component in promotion decisions. A recent example includes a female attorney who, though graduating from law school the same year as a male attorney, was promoted 2 years later than her male attorney peer. Another female attorney was terminated approximately one year after her return from maternity leave because, in the post-leave 'ramp up' described above, she was considered "slow." Male attorneys with slow periods in work or collections, family needs or medical issues, are not pressed to take leave on the same frequency as female attorneys and do not experience similar impediments to compensation or promotion.

20. Where credits are to be shared among several, male and female, shareholders, the female shareholders are excluded from rainmaking opportunities or given proportionately less share of the credit for successful proposals or work. The Firm has expended tens of thousands of dollars a year to participate in legal networks that result in substantial originations, all of which are reserved for male shareholders. These networks include the USLAW Network and International Law Firm Network. Moreover, when lawyers and law firms recruited from such networks to join the Firm, their fees generated are also considered originations of these senior male shareholders for compensation purposes. Moreover, when lawyers and law firms recruited from such networks join the Firm, these same male attorneys receive substantial recruiting bonuses.

21. The Firm's supplemental retirement plan is also administered in ways that favor male shareholders. The lucrative supplemental retirement plan takes priority over funding the Firm's regular 401K contribution. Until this year, the supplemental retirement plan, which is matched 100% by the Firm, was available only to attorneys making $350,000 per year for two consecutive years. Upon information and belief, few female attorneys were compensated at this level, the result being that the gap between male and female shareholders' compensation was increased even more by the Firm's contributions to the supplemental retirement plan. The Firm contributes little to the retirement of other Shareholders and employees (for example, the Firm contributed less than $2,500 to my retirement last year.)

22. The Firm has allowed Shareholders participating in the supplemental retirement plan (primarily, if not exclusively, males) to use the Firm's contribution to purchase preferred stock, which pays an 8% dividend. The Firm does not pay dividends on common stock. The (mostly) male shareholders participating in the supplemental retirement plan were, therefore, able to use the Firm contribution "money" to purchase their preferred shares. By comparison, most female shareholders that purchased preferred stock were required to pay for shares through payroll deductions. The impact of the Firm's compensation decisions, and reserved benefits to the male shareholders that benefit from such decisions or practices, result in lesser compensation to female shareholders.

23. Although I have performed at, and above, levels that are generously rewarded for male shareholders, I have not been compensated at levels similar to my male shareholder peers. I have played a significant role in some of the Firm's most prominent cases, in addition to contributions to the legal profession through service as an Adjunct Professor at Washington & Lee University School of Law, pro bono work, and community service as a Director of the Lewis Ginter Botanical Gardens.

(continued on next page)

Case 3:15-mc-00003-REP Document 1-1 Filed 04/24/15 Page 5 of 9 PageID# 12

*(page 5 of 9)*
Charging Party: Michele Burke           Amended Charge No: 438-2015-00345
Respondent: LeClairRyan, a Professional Corporation

24. My FY 2012 contributions included the extraordinary result of a $20+ million fee recovery to the Firm in a highly publicized case, *Colgate v. Disthene*, where I served as co-lead counsel. The case, which involved a 3 week trial with over 30 witnesses and some 1420 exhibits, and subsequent derivative and trust litigation which settled just prior to argument at the Virginia Supreme Court, included the judicial dissolution of a company on behalf of minority shareholders, resulting in removal of two trustees and the buy-out of our minority shareholder clients for $77 million. The case was identified by Virginia Lawyer's Weekly as Virginia's largest civil settlement in 2013 – the approximately $23.5 million in fees received from 2010-2013 was also the largest fee recovery in the Firm's history.

25. The case generated hourly fees of approximately $3.5 million during the first two years of the case, before the Firm accepted a contingency fee arrangement; however, the Firm attempted to deny me credit for the hourly fees generated and avoid proper credits by denying my role in salvaging the client relationship, and origination credit, and mischaracterizing the recovery so as to deny me compensation.

26. My team's efforts were key to propping the Firm's sagging financial condition in years that it struggled to make budget. On July 29, 2011, when I went to see a client to obtain a $523,000 check the client was prepared to provide, I was asked by the Firm CFO (at the direction of LeClair) to additionally have the client write a second post-dated check for the balance of a $1.15 million fee due. I explained the issue to the client and also obtained the second check. Receipt of the check made a key Firm goal for management and shareholder compensation. Within minutes of sending me an email "You're my hero Michele... thank you very much," the Firm CEO Freinberg sent another email announcing that the Firm had "exceeded its collection goal." Fees from this case, and my role in client interfacing, played prominent roles in the Firm's financial success toward goals in 2011-2013.

27. This client had terminated the Firm and originating attorney, Doug Sbertoli ("Sbertoli"), and requested return of the files, and it was only through my efforts that a new client relationship was created. Nevertheless, Hern and Freinberg denied me the origination credit on the $3.5 million fee in favor of Sbertoli, who the client had terminated, ending any supposed "origination" and denying my origination of the client by salvaging the relationship and client for the Firm. Hern and Freinberg refused to apply a clearly applicable policy exception that dictated that I should receive the credit.

28. As a consolation, Freinberg told me that the Firm would give me a pay raise and bonus and said I would be eligible for promotion "a year early" in 2012. I responded that, per policy, I should be promoted in 2011 under the promotion policy due to my business generation excellence. I consistently exceeded 2,000 hours per year, had excellent evaluations, obtained objectively proven results and met the Firm's "WOW! Business Generation Excellence" exception to the 10-year practice requirement. The failure to promote me in 2011 disregarded my FY 2011 file originations of over $2.5 million, working attorney fees of over $600,000, with a 3-year average of over $1 million originations and over $550,000 working attorney fees. Freinberg's unilateral decision was contrary to promotion policy, which requires a committee to review applications for promotion and to make recommendations to the CEO. Freinberg side-stepped the promotion committees to deny me promotion in 2011, which has continuing compensation effects to the present.

29. Had I received the origination credit and promotion, I would have been eligible for (and under compensation policy entitled to) a large raise each year for the next 3 years. I would have been eligible for an Extraordinary bonus in 2011, and if promoted, a Shareholder Allocation of the *Colgate* case fees.

30. I was the attorney responsible for bringing in the *Colgate* case, analyzing the merits and selecting the team. I initially involved the male shareholder in charge of the Firm's business litigation team, because he and I had successfully tried a previous trust dispute for the same client. He removed himself from the case before it was filed because he disagreed with the way I proposed handling the case, remarking that he thought that the clients

*(continued on next page)*

*(page 6 of 9)*
Charging Party: Michele Burke
Respondent: LeClairRyan, a Professional Corporation
Amended Charge No: 438-2015-00345

were greedy and "should be thankful" for what we had obtained in the last case. He displayed anger toward me that would not have been displayed toward a male shareholder with differing views on how to proceed in a case and told me that I would be lucky to get the clients $200 per share. The court's approved settlement resulted in nearly $2,000 per share for the clients ($50 million) plus payment of their legal fees – a $20 million contingency fee for the Firm for 2 years of work, the first several years having been paid on an hourly basis.

31. In addition to the *Colgate v. Disthene* cases, I had been involved in many other successful complex cases, including cases involving antitrust, business conspiracy, maritime litigation and ownership interest litigation. During my 11 year tenure with the Firm, I have consistently worked in excess of 2,000 billable hours per year, generated $7.9 million in revenue for the Firm from my working attorney collections, originated over $24 million in business for the Firm, and received excellent performance evaluations. Male shareholders with this level of success would be rewarded and valued in compensation decisions. As indicated below, I was punished and marginalized and my accomplishments largely ignored as it related to compensation decisions under Firm policies.

32. Sbertoli resigned in 2013. I was later told that I would receive the origination credit for the contingent fee part of the case if we won, but would still not receive any credit for the $3.5 million in hourly fees paid by the client after I convinced them to allow me and the Firm to handle the case. While the $20 million contingency fee should have resulted in a huge adjustment to my compensation in 2013 (beginning in 2014), it did not. After the Firm received the $20+ million fee, it changed the Extraordinary Bonus policy from an objective point-based system to a subjective, discretionary system and denied me much of what I would have received under the policy in effect when the fee was received. My Extraordinary Bonus was $40,000 – the only bonus I received for my $20,418,000 origination. While I did receive a bonus under a separate contract between the Firm and myself, John Craddock ("Craddock") and Tom Wolf ("Wolf"), it was for our management of the *Colgate* case and was not for case origination, which was due separately. This case management bonus was shared with 2 associates and a paralegal. The Firm then changed the policy on such contingency fees case management contracts. Due to their shareholder status, Craddock, my co-lead counsel, and Wolf actually received more than I did because (1) their salaries were each over double mine, and (2) they received a shareholder allocation of more than $75,000 each for the case.

33. I was elected as a shareholder effective January, 2013; however, the Firm refused to waive my shareholder buy-in, as it had for several male partners with lesser proven performance. The disparate treatment against me affected my ability to pay the $100,000 shareholder buy-in, as it was 63% of my salary. After becoming a shareholder, I learned that the firm has a goal of having each attorney have 30% of base salary invested in common stock and preferred stock, because most did not. With a $100,000 buy-in, that meant that most shareholders (who are predominantly male) earn at least $300,000 per year salary, almost double what I make.

34. When I applied for promotion, it was with the understanding that officers were given raises in an amount that would cover the loan payments to Wells Fargo, the bank that the Firm works with to provide shareholder buy-in loans. When I received my new compensation sheet for 2013, it showed that I would be making less in 2013 than 2012, because more salary was "held back" as contingent salary, meaning that if the Firm did not make budget, I would not receive this contingent portion of my salary. I was going through a difficult divorce at the time with two sons in college and was having difficulty qualifying for the buy-in loan. I asked the Firm, through the head of Litigation, for assistance and offered to pledge my year end salary, but was refused. In two letters, the Firm advised Wells Fargo of my 2012 compensation and projected 2013 compensation levels – the first at levels that would not allow me to qualify for the loan, and the second at levels under which I qualified, but appeared to indicate to Wells Fargo that these were guaranteed amounts rather than the "year end" contingent salary.

35. When I refused to sign loan documents because I could only pay the loan if I received the contingent portion

*(continued on next page)*

(page 7 of 9)
Charging Party: Michele Burke
Respondent: LeClairRyan, a Professional Corporation
Amended Charge No: 438-2015-00345

listed, Hern came to my office and insisted that I sign the loan document. Even though we had won the *Colgate* case, but on appeal which we felt confident we would win, with a $20 million contingent fee, Hern still refused to guarantee the year end compensation figure provided Wells Fargo. He said that any guaranteed year end salary would need to be voted on by the shareholders - and I immediately offered to present it to the shareholders. But he refused to take the matter to the shareholders, insisting that I sign the loan documents. The conversation became heated, ending with Hern stating that we would see what the Supreme Court of Virginia did. I learned that it would only have taken a Board vote (not a vote of all shareholders) to guarantee my year-end salary. Hern acted unilaterally and without authority when he refused my request, and gave me the impression that it would require a shareholder vote in an effort to intimidate me into signing the loan document.

36. However, when the *Colgate* case settled before Supreme Court of Virginia arguments, and the Firm was assured of a $20+ million fee, Hern and Freinberg still refused to assist me with my shareholder buy-in loan or waive my buy-in, as they had done for other shareholders. When the fee was received by the Firm and deposited in the Firm accounts, I received a one sentence email from Hern that the Firm would deduct $100,000 from the amount it owed me under the contingency fee bonus contract with the Firm. I emailed back "OK."

37. While the $20.7 million origination credit and my working attorney collections in the *Colgate* case ($4.7 million the Firm collected for my time) in 2013 should have resulted in a huge Extraordinary Bonus in 2013 with commensurate raises in 2014 and 2015, the Firm acted to try to force me to accept a salary *reduction.*

38. In 2013-2014, I actively marketed and originated new cases, including a contingent fee claim for unpaid royalties against a gas company and an arbitration against an international mining company for failure to pay royalties. I also pursued a marketing plan of marketing to institutional trustees for repeat billable work. The Head of Litigation never raised any issue with respect to my work or my marketing efforts. I was under the impression that he approved of my plan and was in full agreement – until November, 2014.

39. We prevailed on the arbitration, an hourly case for a major trust company, and it is on appeal. When Chair LeClair heard about the favorable result in the arbitration, an hourly case, he asked me if that was contingent. LeClair encouraged me to accept more contingent fee gas royalty cases. I have a great track record with contingency fee cases and the Firm encourages good contingent fee cases. Under the policy, an attorney submits a contingency fee approval form to the Litigation Department Leader, who forwards the form to the CEO for final approval. The CEO has discretion to approve the case, which decision is final and non-appealable. Business litigators are encouraged to take contingency fee cases and the Firm strives to handle 5-7% of its litigation on a contingent fee or bonus basis. The policy states that the business litigation team shall take intra-corporate disputes.

40. In November, 2014, I followed Firm policy in attempting to obtain approval for a contingency case involving an intra-corporate dispute. I obtained approval from the Litigation Team Head, Erik Gustafson ("Gustafson"), but CEO Freinberg decided that in order for him to approve the case, I had to reduce my compensation. He said that since I only worked on contingent cases (which is not true), the Firm has no place in its budget for such a lawyer and I should come up with a proposal on the reduction. I refuted the notion that I only work on contingency fee cases with specific examples of my billable work. When I told Gustafson that I was not getting internal referral work, he stated that he had internal work he could send, me *but was not going to do so.* This is the second time that Gustafson had told me this. He previously had told me that if any business litigation work comes to Richmond internally, I would never get it – "it will go to Sims, Wolf or Craddock," who are male business shareholder litigators in Richmond. I relayed this to Freinberg and explained all of the billable work I do, but he ignored this and repeated the script that I did only contingency work and had to take a salary reduction.

41. Gustafson did not tell the (male) attorney who originated the case and would get that credit, Wolf, or Craddock,
*(continued on next page)*

both of whom would work on the case and who work on many contingency cases, that they had to reduce their compensation before Freinberg would approve the case. I refused to take a salary reduction and told Freiberg that under Firm policy, I should receive a huge pay raise. After leaving the client hanging for over a month (although Firm policy is to act with urgency with respect to client matters), Freinberg had the Board vote not to take the case, even though Firm policy places that responsibility on Freinberg. This, despite the fact that all the litigators who reviewed my analysis of the case (Wolf, Gustafson, and Matson) agreed that it was a great case and recommended that Freinberg approve it. To my knowledge the Board has never been asked to vote on the Firm's decision to take a contingency case.

42. Freinberg's demand that I reduce my salary in order for him to approve the case is unprecedented, and in violation of Firm policies. It is completely outside the normal compensation reviews process. It completely ignores my 3-year performance metrics, including my originations, which is what drives male shareholders' compensation so high. By comparison, my compensation is far below market. I have not been given adjustments in accordance with the shareholder (or officers) compensation policy – based on merit, not seniority, with top performers compensated above market.

43. By demanding that I take a pay reduction, the Firm has placed undue restrictions on my ability to accept certain cases, restrictions not applied to male shareholders. Male shareholders, such as Wolf, are not held to the written policies when making decisions regarding acceptance of a case. Moreover, the Firm has selectively made the approval process more stringent for me than for male shareholders.

44. When I complained about the selective and gender discriminatory basis for compensation, I was asked to accept a reduction in compensation and it has been suggested to me that I could be terminated.

45. I have discussed my concerns with Bruce Matson, the Firm's Chief Legal Officer, Erik Gustafson, the Firm's Litigation Group Leader and met with David Freinberg, the Firm's CEO, to discuss the continued gender based hostility toward me, which affects my work environment within the Firm. Thereafter, I was asked by Michael Hern, the Firm's Vice Chair, to sign Firm agreements, but was denied the opportunity to review requested related documents which, according to the agreements, are made available to other shareholders for review at their request. The Firm twice threatened me by telling me it would take "appropriate action" against me (suggesting I would be terminated) if I did not sign the documents by a given deadline – the first by close of business the Monday before Christmas, the second by noon the Monday after Christmas. The documents they were trying to intimidate me into signing contained statements the Firm knew to be false. Therefore, I refused to sign them as written. I believe that this selective treatment, in approval of cases, efforts to force compensation reductions, and threats regarding my employment were directly related to my having opposed selectively negative treatment and having filed an internal claim of gender-based discrimination.

46. On January 21, 2015, I received a memo from Freinberg dated January 19, 2015, copied also to Gustafson, outlining my compensation plan for 2015. The compensation outlined reduces my expected compensation by approximately 25% and is a complete departure from the Firm's shareholder compensation plan, in that it fails to provide me credits due under my 3-year averages, deprives me of origination credits awarded male shareholders and includes other terms which are not applicable to male shareholders. Under the existing shareholder compensation policies, which consider originations, my 2015 compensation should be much larger than my 2014 compensation. It further makes significant portions of my compensation contingent on events that do not likewise limit compensation for male shareholders.

(continued on next page)

*(page 9 of 9)*
Charging Party: Michele Burke  Amended Charge No: 438-2015-00345
Respondent: LeClairRyan, a Professional Corporation

47. Comparing the Firm's proposed 2015 compensation plan for me and the compensation a male shareholder I regularly work with is paid, I would continue to make less than half what he makes.

48. In the fall of 2014 it came to my team's attention that we had a conflict of interest in a case we were currently litigating; a conflict which could potentially require us to withdraw from the engagement. I approached Matson, Gustafson, and others about the conflict. After Matson determined that the Firm could continue representation from a conflicts perspective, the Firm then undertook a business analysis of the suitability of the case for the Firm to handle. These discussions continued through December, 2014. The conflict issue arose again in January, 2015 and I again brought it to Gustafson and Matson's attention. Matson declined to alter the Firm's conflict position, insisting there was no conflict. I reviewed the file and determined that Matson had not made a proper analysis of the conflicts issue. Other Firm shareholders agreed with my analysis. Although Matson indicated that he would again review the conflicts issue, after two weeks, I contacted the Virginia State Bar for an advisory opinion and was advised that I, and the Firm, had an irreconcilable conflict requiring immediate withdrawal. I believe that the Firm was intentionally placing me in a conflicts situation to support its position that I only worked on contingent cases, in retaliation for my opposition to my compensation treatment, and to leverage its position related to my charge of discrimination. On or about February 2, 2015 I submitted notice of my resignation from employment and withdraw as a shareholder, effective March 4, 2015 and obtained independent ethics counsel regarding withdrawal from the case. The Firm continued to ignore, delay or otherwise dispute my attempts to withdraw from the case due to ethical standards. Given the continued reductions in my compensation, the continued retaliation in the terms and conditions of my employment, and the Firm stance on the conflict/withdrawal issue I felt I had no choice but to tender my resignation resulting in my constructive discharge.

49. I have suffered damages as a result of the impact of the Firm's compensation policies as well as the treatment directed against me, professionally, emotionally, and in other terms and conditions of my employment affected by the Firm's repeated instances of gender based disparate treatment and retaliation. My situation is not unique among female attorneys, officers and shareholders of the Firm, but my experience has been more pronounced because I have continued to insist on my rights to equal opportunities irrespective of my gender. Other female attorneys, as a class, are similarly situated and have suffered similar forms of gender-based discrimination from the Firm. The discriminatory pay practices are systemic and ongoing, dating back to at least my 2003 hire with the firm, and affecting hundreds of female attorneys and dozens of female shareholders during that time period.

50. I believe I have been discriminated against because of my gender (female) and retaliated against in violation of Title VII of the 1964 Civil Rights act, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. §§ 2000e, *et seq.* and the Virginia Human Rights Act, Code of Virginia § 2.114, *et seq.* and that those similarly situated females have been discriminated against on the basis of their gender (female) in violation of Title VII of the 1964 Civil Rights act, as amended, and the Virginia Human Rights Act, Code of Virginia § 2.114, *et seq.*

NOTARY PUBLIC
REG # 7237318
MY COMMISSION EXPIRES
4/30/2018

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures

NOTARY (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

I declare under penalty of perjury that the foregoing is true and correct

2/5/2015
Date    Charging Party (Signature)

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, Month, and Year)